# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **JUDITH EARLEY,** | ) |
| Plaintiff, | ) Case No. 2:06CV00077 |
| v. | ) **OPINION** |
| **JOHN MARION, ET AL.,** | ) By: James P. Jones |
| | ) Chief United States District Judge |
| Defendants. | ) |

*Hilary K. Johnson, Hilary K. Johnson, P.C., Abingdon, Virginia, for Plaintiff; Jim H. Guynn, Jr. and Susan A. Waddell, Guynn, Memmer & Dillon, P.C., Salem, Virginia, for Defendants.*

In this civil action seeking damages for the suspension with pay of a public school teacher, I find that the plaintiff has failed to present sufficient evidence of her constitutional or state law claims and thus enter summary judgment in favor of the defendants.

I

The plaintiff Judith Earley, employed by the Lee County, Virginia, public school system, brought this action alleging that she had been improperly suspended from her duties as a kindergarten teacher pending a mental or psychiatric evaluation. The defendants are John Marion, Phil Hensley, Gary Brown, Homer "Pete" Sumpter,

and Donnie Brooks, who are all members of the Lee County School Board ("School Board"); Fred Marion, the Superintendent of Schools; and Lisa Stewart, the school principal. The suit bases recovery on 42 U.S.C.A. § 1983 (West 2003) and a pendent state cause of action for intentional or negligent infliction of emotional distress.

Following discovery, the defendants have moved for summary judgment in their favor, which, after briefing and oral argument, is ripe for decision.

II

Summary judgment is appropriate when there is "no genuine issue of material fact," given the parties' burdens of proof at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see* Fed. R. Civ. P. 56(c). In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Ross v. Commc'ns Satellite Corp.,* 759 F.2d 355, 364 (4th Cir. 1985).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Id.* at 327. It is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotations omitted).

The essential facts of the present case, recited in the light most favorable to the plaintiff on the summary judgment record, are as follows.[1]

After teaching kindergarten at Dryden Elementary School ("Dryden") for many years, the plaintiff requested and was granted a transfer to Elk Knob Elementary School ("Elk Knob"), in part, because of perceived harassment by co-workers at Dryden. Soon after the transfer, the plaintiff began having problems with the defendant Stewart, principal of Elk Knob, who the plaintiff believed harbored animosity towards her. These problems included receiving a classroom without standard furniture such as a teacher's desk, having her name left off a list of new teachers in the school newsletter, and receiving insufficient support from Stewart in dealing with parents who interrupted her class and a problem student. The plaintiff experienced other incidents that she perceived as harassment. On several occasions

---

[1] The record contains lengthy deposition transcripts of the parties and others, as well as transcripts of the hearing held before the School Board.

- 3 -

she found bags of trash or other items outside the door of her trailer classroom. On another occasion, she found a piece of candy in the hood of her sweatshirt and accused Stewart of putting it there. In November 2005, the plaintiff, her husband, and Stewart met to discuss these problems. At this meeting, Stewart allegedly told the plaintiff that she needed to go on medical leave or "look[] for somewhere else to go for the next four years." (Pl.'s Dep. Day 1, at 133.)

Stewart was not the only person with whom the plaintiff had problems. Several teachers reported that the plaintiff had raised her voice at them for seemingly innocuous reasons—such as touching the plaintiff's shoulder while walking behind her or not knowing the whereabouts of a video from the library. The Elk Knob guidance counselor, Vickie Haley, described how she had to stand between the plaintiff and two parents to diffuse tensions after a parent-teacher conference became heated.

On March 10, 2006, a school janitor, Geneva Jones, approached the plaintiff and inquired as to whether her classroom smelled of Clorox and allegedly explained that "[i]f Vicky Haley's youngest son had been cleaning in your room, it would have." (Pl.'s Dep. Day 1, at 152.)[2] The plaintiff asked Haley why Jones would have made

---

[2] Apparently some children whose parents worked at Elk Knob would assist the janitorial staff in the afternoons while waiting for their parents to finish work.

- 4 -

such a remark and whether Haley had been involved in any of the incidents of harassment the plaintiff had experienced. Haley stated that she did not know why Jones had made that remark and that she had not been involved in any harassment. Haley later made a written statement about this incident, in which she stated:

> My blood pressure was taken by the school nurse after this happened and it was 156/110. My head is hurting very badly and I am a nervous wreck. I feel threatened for myself and my children since my child's name has been specifically mentioned and [she] tried to incinuate [sic] that my child has been involved with myself in conspiring against her.[3]

(Pl.'s Resp. Br. to Defs.' Mot. Summ. J., Ex. D.) After this incident Haley took a leave of absence from Elk Knob.

Because of this incident, Principal Stewart told Elk Knob faculty and staff that she wanted them to attend the March 13, 2006, School Board meeting. The plaintiff was not advised that she would be discussed at this meeting and was not present. At this meeting, Stewart presented a letter to the School Board from "Elk Knob Faculty and Staff" describing "accusations, verbal attacks, and out of control behavior" allegedly made by the plaintiff and stated that "many teachers feel unsafe and

---

[3] The plaintiff has challenged the authenticity of this statement. When shown this statement, Haley stated that it was not the original, nor was it in the format in which she had written it, but that she thought it contained her own words as she had written them.

- 5 -

threatened."[4] (Pl.'s Resp. Br. to Defs.' Mot. Summ. J., Ex. E.) She also presented Haley's statement concerning the incident with the plaintiff and the effect it had on her. The School Board called Haley via speaker phone to confirm her statement, although nothing in the record indicates what was said during this conversation.[5]

Following this School Board meeting, Superintendent Fred Marion sent the plaintiff a letter informing her of her suspension. In explaining his decision, Marion noted that a faculty member had sought medical treatment and taken family leave because she had felt that the plaintiff had threatened her and her son. He also noted that the plaintiff's actions had been "unsettling" to some of her colleagues and that "actions had to be taken to prevent physical altercations with parents at conferences with you." (Pl.'s Resp. Br. to Defs.' Mot. Summ. J., Ex. A.) Marion also contacted Stewart that morning to advise her of the plaintiff's suspension. The plaintiff alleges that Stewart advised other faculty and staff of the suspension before the plaintiff had

---

[4] Stewart admits that she had no first hand knowledge of the incidents contained in this letter and that it contained information given to her by other teachers. She also admits that no other faculty or staff member reviewed this letter before she presented it to the School Board.

[5] The plaintiff alleges that Haley denied that she had felt threatened and stated that she did not want to be used as a scapegoat for suspending the plaintiff. However, the plaintiff was not present at this School Board meeting and presents no evidence to substantiate her version of this conversation.

- 6 -

received word. In addition, there were rumors of the plaintiff's suspension at Dryden and on the Internet before the plaintiff herself found out.

The plaintiff requested and received a grievance hearing before the School Board on April 25, 2006, to challenge her suspension.[6] Numerous witnesses testified at the grievance hearing. Several teachers recounted how they had been yelled at by the plaintiff for seemingly minor offenses or innocuous statements and the plaintiff responded by denying that she ever raised her voice in these conversations. Several parents testified that their children had reported that the plaintiff was often unhappy or angry in the classroom and frequently yelled at her students; others stated that their children had never reported such incidents. A grandparent volunteer, who spent significant amounts of time in the plaintiff's classroom, testified that she had never seen the plaintiff get upset or angry or cry during the school day and the plaintiff also denied this allegation. In addition, several teachers testified that the plaintiff had left the children in her class outside without supervision. The plaintiff vehemently denied this allegation, as did the grandparent volunteer.

---

[6] The plaintiff's attorney issued subpoenas to witnesses for this hearing. The plaintiff alleges that Stewart, Marion, and School Board attorney Greg Edwards, informed several of these witnesses that they did not need to show up at the hearing, but there is no evidence as to what these witnesses would have testified to.

- 7 -

Haley testified, in regard to the incident with the plaintiff, that she had not felt threatened so much as awkward and uncomfortable and that it was a "nerve-wracking situation." (Defs.' Br. Supp. Mot. Summ. J., Ex. A, 97.) She further testified she had been having medical problems throughout the school year, as well as disagreements with Stewart and Stewart's husband. The plaintiff testified that at no point during her conversation with Haley had she raised her voice or threatened Haley or her child. The plaintiff argued that Haley's decision to take medical leave was not entirely based on the incident with the plaintiff, but was because of Haley's health and disagreements with the Stewarts. Several others testified that they were under the impression that Haley took family or medical leave to care for her sick mother.

Haley also testified regarding the volatile parent-teacher conference attended by herself, the plaintiff, the plaintiff's husband, and two parents. Haley contended that it was the plaintiff who behaved in a hostile manner. The plaintiff's husband contradicted this in his testimony, stating that one of the parents was the first aggressor.

Prior to the hearing, the plaintiff sought an evaluation by licensed clinical social worker, Deidra Fisher-Taylor, who then testified on the plaintiff's behalf at the hearing. Fisher-Taylor stated that the plaintiff had no major mental health disorders, but that she did have an adjustment disorder with mixed emotional features based on

being removed from her classroom. She further stated that the plaintiff was not a threat to herself or anyone else and that in her opinion the plaintiff was not suffering from paranoia. The plaintiff also brought a letter from her treating physician stating that the plaintiff had been examined on June 29, 2005, following her hysterectomy, and had been cleared to return to work.

After the grievance hearing, the School Board voted to uphold the plaintiff's suspension, with pay, pending a full medical and psychiatric assessment by a provider of the School Board's choosing.[7] In a May 19, 2006, letter explaining this decision to the plaintiff, defendant Gary Brown stated that the plaintiff would be contacted to set up the required appointments.[8]

---

[7] The plaintiff contends that several of the School Board members behaved inappropriately in so voting. John Marion voted to uphold the suspension, despite the fact that he left the grievance hearing before the presentation of the plaintiff's evidence and did not recall having ever read the transcript. He also voted on this issue, despite the fact that the original suspension was granted by his brother, Superintendent Fred Marion. Gary Brown stated that he voted to uphold the suspension on Fred Marion's recommendation. The plaintiff also contends that the School Board did not give proper weight to the opinion of licensed clinical social worker Deidra Fisher-Taylor. When questioned about the necessity of having the plaintiff evaluated by a psychiatrist instead of a licensed clinical social worker, several of the School Board members expressed confusion over or dissatisfaction with the qualifications of a licensed clinical social worker.

[8] It appears that no such evaluation has yet taken place. The plaintiff's counsel indicates that she was told by the defendants' counsel that he was attempting to find medical providers with no apparent conflicts. One of the defendants stated in a deposition that the defendants' counsel had sent a letter to the plaintiff's counsel with a list of medical providers for the plaintiff to choose from.

- 9 -

Following her suspension, the plaintiff claims that she has been the subject of rumors and insensitive statements. She alleges that Hensley told parents and others that the plaintiff needed a pill for menopause and a mental evaluation. Fred Marion allegedly told parents that the plaintiff had been suspended pending a psychiatric examination and was not fit to teach students. Finally, Stewart allegedly made statements in front of parents insinuating that the plaintiff was a thief.

Since her suspension, the plaintiff says that she has experienced emotional and physical symptoms, including renewed anxiety requiring anxiety medication and a weight loss of approximately ten pounds.

III

Summary judgment is appropriate in this case because the plaintiff has failed to make a showing sufficient to establish any violation of her right to substantive or procedural due process.[9]

---

[9] The plaintiff also complains that the defendants have violated her "right to privacy" by requiring that she submit to medical and psychiatric evaluations before being permitted to return to work. The plaintiff's argument is without merit. School boards and other employers are permitted to assess their employee's medical condition as it relates to their fitness to perform their job. *See Porter v. U.S. Alumoweld Co.*, 125 F.3d 243 (4th Cir. 1997) (holding that the plaintiff's termination for refusing to undergo an evaluation of his fitness to return to work following surgery did not violate the ADA); Va. Code Ann. § 22.1-301 (2006) (requiring a school board to pay the costs of a medical examination required as a condition of continued employment).

Although the plaintiff does not specify the exact nature of the substantive due process violation in her complaint or other filings, she appears to be arguing that the defendants' decision to suspend her pending a medical or psychiatric evaluation is incorrect. In such cases, the reviewing court "may not usurp the discretionary power of the school board" but must judge the constitutionality of the decision based on the grounds invoked by and facts before the school board. *Johnson v. Branch*, 364 F.2d 177, 181 (4th Cir. 1966); *Lee v. Albemarle County School Bd.*, 648 F. Supp. 744, 749 (W.D. Va. 1986) ("[A]ll the plaintiff has standing to ask of the court here is to determine whether there was evidence before the school board supporting its decision."). The record shows that there was ample evidence supporting the defendants' decision to suspend the plaintiff pending evaluation and thus there is no constitutional deprivation of substantive due process.[10]

The plaintiff also argues that her right to procedural due process was violated. In order to demonstrate a procedural due process violation, the plaintiff must show that she has a constitutionally protected property or liberty interest, which she has

---

[10] In his March 14, 2006, letter suspending the plaintiff, Superintendent Marion stated that the suspension was due to safety concerns after the incident with Haley and noted that the plaintiff's actions had been unsettling to her colleagues and that there were incidents involving parents that could have led to physical altercations. These legitimate reasons for the plaintiff's suspension are supported by evidence presented at the March 13, 2006, School Board meeting. The April 25, 2006, grievance hearing included evidence that supported the School Board's decision to uphold the plaintiff's suspension.

been deprived of by state action without a sufficient hearing or opportunity to contest the deprivation. *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 (1972); *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988).

The plaintiff complains that her suspension constitutes a deprivation of her property interest in her employment. However, "any constitutionally protected property interest [an employee has] as a result of his employment contract [is] satisfied by payment of the full compensation due under the contract." *Huang v. Bd. of Governors*, 902 F.2d 1134, 1141 (4th Cir. 1990); *accord Fields v. Durham*, 909 F.2d 94, 98 (4th Cir. 1990). The record demonstrates that the plaintiff continues to receive her full salary and benefits while suspended, so there is no deprivation of any property interest.

The plaintiff further complains that the defendants' "numerous publications of untrue and inaccurate statements regarding the plaintiff, her mental health, and her fitness to perform her position of employment, that of a kindergarten teacher" have denied her the right to work in her chosen occupation. (Compl. ¶ 29.) "[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential. In such a case, due process would accord an opportunity to refute the charge." *Roth*, 408 U.S. at 573 (internal quotations and citations omitted). However, defamation

alone, without a connection to "tangible interests such as employment," does not invoke the due process clause. *Paul v. Davis*, 424 U.S. 693, 701 (1976). Thus, for a liberty interest to have been implicated the defamation must have occurred "in the course of the termination of employment," *Id.* at 710; *Robertson v. Rogers*, 679 F.2d 1090, 1091 (4th Cir. 1982), or "some damage to [the plaintiff's] employment status must have resulted from publication of the reasons for [the change in status]," *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990). The liberty interest protected is not continued employment but the opportunity to "clear [one's] name against unfounded charges." *Id.* (internal quotations omitted).

The publications that the plaintiff complains of include Stewart insinuating that the plaintiff is a thief, Hensley telling parents and other third parties that the plaintiff needed a pill for menopause and a mental evaluation, and Fred Marion telling parents that the plaintiff had been suspended pending a psychiatric evaluation and was not fit to teach. All of these alleged statements and any other stray remarks or rumors were made after the plaintiff's suspension and thus did not occur "in the course of" the suspension or any other adverse employment action. Further, none of these publications resulted in any damage to the plaintiff's employment status as she remains employed, albeit suspended. *See Johnson*, 903 F.2d at 999-1000 (finding that a demoted employee suffered no damage to employment status because he

remained employed and thus his situation "differs from that in which a discharged employee's opportunity for other gainful employment is thwarted by the publication of the reasons for his discharge" (internal quotations omitted)).

Further, even if these remarks rose to the level sufficient to implicate the plaintiff's liberty interests, the plaintiff received all the process she was entitled to in order to clear her name. The plaintiff requested and was granted a full and lengthy hearing before the School Board following her suspension. At this hearing the plaintiff was represented by counsel, presented witnesses, and cross-examined witnessed called by the Superintendent. Although Virginia law entitles the plaintiff upon request to a public hearing, *see* Va. Code Ann. § 22.1-311 (2006), the plaintiff did not so request.

Because the plaintiff has failed to demonstrate that she suffered a deprivation of her constitutionally protected property or liberty interests, or any other constitutional violation, her federal claims will be dismissed.

IV

The plaintiff also asserts a pendant state claim for intentional or negligent infliction of emotional distress. While I have dismissed the plaintiff's federal claims,

I find it appropriate to also rule on the state law claims, in light of the extensive proceedings in this case.

Under Virginia law, a successful claim for intentional infliction of emotional distress requires proof of (1) intentional or reckless conduct (2) that is outrageous and intolerable and (3) that causes severe emotional distress to the plaintiff. *Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir. 1987) (citing *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974)).

Whether conduct is sufficiently outrageous to permit recovery is a question of law for the court. *Gaiters*, 831 F.2d at 53; *Womack*, 210 S.E.2d at 148. "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Gaiters*, 831 F.2d at 53; *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991). Liability "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Gaiters*, 831 F.2d at 53.

The plaintiff alleges that she was harassed by Stewart, wrongly suspended from her position as a kindergarten teacher by the School Board, and subjected to mean-spirited rumors about her emotional and mental fitness to teach. None of this alleged behavior rises to the level where it could be considered outrageous or intolerable. *See*

*Pacquette v. Nestlé USA, Inc.*, No. 4:06CV00060, 2007 WL 1343794, *5 (W.D. Va. May 7, 2007) ("While being fired on what the Plaintiff alleges are trumped up charges of dishonesty is both embarrassing and hurtful, it is not the sort of conduct which is utterly intolerable in a civilized community." (internal quotations omitted)); *Baradell v. Bd. of Soc. Servs.*, 970 F. Supp. 489, 494-95 (W.D. Va. 1997) (finding that conduct was not sufficiently outrageous or intolerable where defendants terminated plaintiff's employment, obstructed her right to a grievance hearing and told other employees that plaintiff was fired for falsifying information). The defendants' conduct, if the plaintiff's allegations are to be believed, may have been hasty, unkind or inconsiderate, but did not rise anywhere near the level necessary to sustain a charge of intentional infliction of emotional distress.

Further, the plaintiff's alleged symptoms are not severe. "[L]iability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 163 (finding that plaintiff's emotional distress was not sufficiently severe where plaintiff alleged nervousness, trouble sleeping, stress and an inability to concentrate, and that she had withdrawn from activities and where there were no allegations that the plaintiff had any objective physical injury caused by stress, that she had sought medical attention, that she had been confined at home or in a hospital, or that she had

lost income). The plaintiff has alleged that she suffered from renewed anxiety, was forced to resume taking anti-anxiety medication, and lost approximately ten pounds in weight. These symptoms do not suggest emotional distress so severe that no reasonable person could be expected to endure it.

Similarly, Virginia courts hold litigants to a rigorous standard for negligent infliction of emotional distress claims, requiring proof of a physical injury that was "the natural result of fright or shock proximately caused by the defendant's negligence." *Myseros v. Sissler*, 387 S.E.2d 463, 464 (Va. 1990) (citing *Hughes v. Moore*, 197 S.E.2d 214, 219 (Va. 1973)). A successful claim requires "evidence of 'symptoms' or 'manifestations' of *physical injury*, not merely of an underlying emotional disturbance." *Id.* at 466 (finding that post traumatic stress disorder, anxiety disorder, nausea, difficulties sleeping and breathing, and loss of appetite and weight are manifestations of underlying emotional disturbance, rather than of physical injury). The plaintiff's only alleged physical symptom is a weight loss of approximately ten pounds resulting from her increased anxiety. As such, this does not constitute a physical injury, so much as a manifestation of emotional disturbance, and recovery is inappropriate.

## V

For all of these reasons and after careful consideration of the voluminous record, I find that summary judgment in favor of the defendants must be granted. A separate final judgment will be entered herewith.

DATED: March 31, 2008

/s/ JAMES P. JONES
Chief United States District Judge